**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICE SEIZED ON DECMEBER 6, 2023, FROM EUGENE FISHBACK AND CURRENTLY IN POSSESSION OF THE DEA LEXINGTON RESIDENT OFFICE, LEXINGTON, KY** | **Case No. Case No. 5:23-MJ-5402-MAS** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jason Moore, being duly sworn, do hereby depose and state:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device (more particularly described below in in Attachment A, incorporated herein)—which is currently in law enforcement possession, and the extraction from the device of electronically stored information described in Attachment B (incorporated herein).

2.      I am a duly sworn Special Agent (SA) of the United States Drug Enforcement Administration (DEA) and have been assigned as such since 2009.  In that capacity, I am authorized to apply for a warrant under Rule 41 of the Federal Rules of Criminal Procedure.

3.      I am currently assigned to the Lexington Resident Office (LRO) and have been since August 2015.  My current duty assignment includes, but is not limited to, investigating complex drug conspiracies and organizations and individuals involved in the possession of and trafficking in controlled substances.  Prior to my current assignment with the DEA, I was a felony prosecutor in the 44th and 22nd Judicial Circuits in the state of Kentucky from

1

approximately 2004 to 2009.  I am authorized and have the responsibility to investigate and arrest persons for violations of federal law, involving the unlawful distribution of drugs, (21 U.S.C. § 841(a)(1)), attempt and conspiracy to commit the same (21 U.S.C. § 846), money laundering; (18 U.S.C. § 1956 and 1957), and illegal possession of firearms (18 U.S.C. § 922 and 18 U.S.C. § 924(c)(1)).

4.      During my tenure with DEA, I have participated in numerous investigations involving violations of federal narcotics laws.  I have attended schools and have been instructed in many aspects of narcotics investigations and am familiar with the narcotic laws promulgated under Title 21 of the United States Code and federal money laundering laws promulgated under Title 18 of the United States Code.  I am aware of the following information from numerous sources, including but not limited to my own personal observations and participation in this investigation and my review and analysis of oral and written reports by members of the Lexington Police Department (LPD).  I have initiated and/or participated in surveillance, the operation and debriefing of numerous drug dealers, drug users, and informants, performed both physical and electronic surveillance, and executed search warrants.  Further, I have analyzed records documenting the purchase and distribution of illegal drugs, and the concealment of illegal narcotics profits.

5.      I know, based on my knowledge, training, experience, and participation in other investigations, and consultations with other experienced investigators that drug traffickers commonly use electronic devices to aid them in their drug trafficking and money laundering activities.  This equipment includes, but is not limited to, cellular telephones, digital display pagers, electronic telephone books, electronic date books, computers, money counters, electronic surveillance equipment, eavesdropping equipment, and portable communication devices,

including MiFi hotspots. These electronic devices often utilize other downloaded "applications" to facilitate communications to similar "applications" on other devices.

6.     Based on my knowledge, training, and experience, and consultation with other experienced investigators, I know that members of drug trafficking organizations and money laundering organizations (DTOs/MLOs) frequently use electronic devices to communicate about the business of distributing drugs, including coordinating meetings for exchanges of drugs and money.  These electronic devices can include, and are not limited to, cellular telephones, computers, PDAs, i-Pods, and other items.  Further, based on my knowledge, training, and experience, I know that these devices often contain phone numbers, contact information, electronic communications (emails, text messages, instant messages, etc.) of members of the DTOs.  I also know that persons involved in drug trafficking and money laundering frequently possess firearms and weapons.  I know that these individuals sometimes take photos or videos of themselves or others with weapons, and store these photos/videos on their communications devices, including cellphones.  Accessing the information described above is critically important for law enforcement to be able to identify members of the DTO and understand the DTOs full scope of operation.

7.     I know based on my knowledge, training, experience, and consultation with legal counsel, that it is a violation of 21 U.S.C. § 841 to possess with intent to distribute a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance; that it is a violation of 21 U.S.C. § 846 to conspire to distribute a controlled substance; that it is a violation of 21 U.S.C. § 841(a)(1) to distribute a controlled substance; that it is a violation of 21 U.S.C. § 843(b) to use a communication device to further a drug offense; that it is violation of 18 U.S.C. § 922(g) for a prohibited person (convicted felon, drug user, etc.) to knowingly and

intentionally possess firearms; that it is a violation of 18 U.S.C. § 922(g)(1) for a convicted felon

to knowingly and intentionally possess a firearm, and that it is a violation of 18 U.S.C.

§ 924(c)(1) for a person to knowingly and intentionally possess a firearm in furtherance of a drug

trafficking crime.

8.      This affidavit is based on my personal knowledge and involvement in the

investigation, and from information I have received from other persons involved in the

investigation, including DEA Special Agents and Task Force Officers (TFO)s and members of

LPD.

9.      The information contained in this affidavit is not a complete account of

everything known to me about this case. Rather, it contains the facts that I believe are sufficient

to support a finding of probable cause to support the requested search warrants.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

10.     I request permission to search the following electronic device that was seized by

law enforcement on December 6, 2023:

        a.   An Apple I phone in a red case seized in conjunction with arrest of Eugene L.
             Fishback in Lexington, Kentucky on December 6, 2023.

11.     The device is currently stored securely at the DEA Lexington Resident Office

located in Lexington, Kentucky.

12.     The applied-for warrant would authorize the forensic examination of the device

for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

13.     Eugene Laron Fishback and his drug trafficking organization (DTO) are the current targets of a DEA investigation. Fishback is currently indicted and has pending criminal charges in Fayette County Criminal Cases 19-CR-00729, 20-CR-00575, and 21-CR-00942-001 for felony charges including Enhanced Aggravated Trafficking Controlled Substance First Degree Fentanyl, Trafficking Controlled Substance First Degree Fentanyl, Trafficking Controlled Substance First Degree Cocaine, Convicted Felon in Possession of a Handgun, and Persistent Felony Offender First Degree. Fishback has been previously convicted of multiple felonies to include Trafficking in Controlled Substance First Degree Cocaine and Convicted Felon in Possession of a Handgun in respective Fayette County Criminal Cases 14-CR-00612 and 15-CR-00838-002.

14.     In October 2023, affiant interviewed a cooperating defendant (CD) who sought consideration for the federal offense of Conspiracy to Possess with Intent to Distribute Methamphetamine. Previously, DEA investigators had seized 632.3 gross grams of suspected fentanyl pills which had been stored at CD's residence located in Lexington, Kentucky. Those pills were subsequently submitted to the DEA Mid Atlantic Laboratory for analysis and determined to be 530.18 grams of a substance containing both phenylethyl and fentanyl. An examination by affiant of CD's cellular telephone seized in conjunction with his/her arrest by affiant revealed a contact listed as "Geno" with telephone number 859-699-8543. Text messages between CD's device and telephone number 859-699-8543 revealed communications involving the sale of pills from CD to the individual utilizing telephone number 859-699-8543 assigned contact ID "Geno".

15.     On October 4, 2023, affiant requested subscriber information for telephone number 859-699-8543 from service provider AT&T via a DEA administrative subpoena. That same day AT&T responded that telephone number 859-699-8543 was subscribed to "Brothers Brand" at 240 Plaza Drive Suite 220, Lexington, Kentucky. This is the location of the "The Porch Barber Shop" which was utilized by brothers Nicolas Petite Frere and Marc Petite Frere to receive large shipments of methamphetamine on behalf of the Mario Sanchez Barba drug trafficking organization. The contact name for telephone number 859-699-8543 was listed by AT&T as Nicolas Petite Frere with a contact email of "theporchbarbershop@gmail.com". Marc Petit Frere and Mario Sanchez Barba were both convicted in the United States District Court for the Eastern District of Kentucky for drug trafficking offenses and sentenced to prison in 2023 for 228 months and 240 months respectively.

16.     On October 17, 2023, DEA LRO Special Agent Christy McHugh applied for and received judicial authorization from Fayette County (Kentucky) District Court Judge Denotra Spruill Gunther to receive location information for telephone number 859-699-8543 from service provider AT&T. On approximately October 19, 2023, service provider AT&T began providing the requested location information.

17.     On October 25, 2023, members of the DEA LRO utilized this location information to confirm that telephone number 859-699-8543 was utilized by Fishback. That day, investigators utilized location data for that telephone number to locate Fishback at multiple sites in Lexington, Kentucky throughout the day. For example, at approximately 11:49 am, SA Christy McHugh observed Fishback walking in the mall south in the direction of anchor store Dillards. At 11:52 am, location data for telephone number 859-699-8543 placed the device in the Fayette Mall parking lot with a certainty of 182 meters. At approximately 12:09 pm, affiant

observed Fishback travel in a vehicle to Speedway located at 2490 Nicholasville Road, Lexington, Kentucky where he exited the vehicle and entered the convenience store. Several minutes later, Fishback was observed to return to the vehicle. The vehicle remained at this location until it traveled across Nicholasville Road at approximately 12:23 pm to Five Guys restaurant located at 2467 Nicholasville Road, Lexington, Kentucky. At 12:19 pm, location data for telephone number 859-699-8543 placed the device on Larkin Road with a certainty of 792 meters, a distance of approximately 2100 feet from Speedway.

18.     At approximately 2:07 pm, DEA surveillance personnel followed Fishback as he approached vehicles parked on York Street, Lexington, Kentucky from the vicinity of house #132. Fishback and a second black male were observed to enter a blue Hyundai sedan with Kentucky tag 312 NJJ registered to Tedi Hawkins at 957 Lane Allen, Drive, Lexington, Kentucky. This vehicle departed the area with surveillance being maintained of Fishback in the Hyundai Elantra. At approximately 7:55 pm, location information for telephone number 859-699-8543 placed the device in the area of Raintree Apartment Homes located at 175 North Locust Hill Drive, Lexington, Kentucky with a certainty of 488 meters. At approximately 8:00 pm, affiant located the Hyundai Elantra with Kentucky tag 312 NJJ parked in front of building 17 at the apartment complex. Affiant maintained surveillance of that building for the next hour with location data for that telephone number continuing to reflect its presence in close proximity to that address. On November 6, 2023, at approximately 7:15 am, affiant confirmed the vehicle's presence at that residence. At approximately 8:09 am, SA Christy McHugh confirmed that location data for telephone number 859-699-8543 reflected that the device was still in the area of Raintree Apartment Homes.

7

19.     On November 6, 2023, affiant was made aware by LPD detectives that an individual had suffered a suspected drug overdose the previous weekend to which she had ultimately passed away.  Investigators spoke to her significant other who stated that the deceased had a source of supply for illegal drugs who utilized the street name "Geno". This individual further stated that "Geno" utilized telephone number 859-699-8543 and identified social media pages known by investigators to have photographs of Fishback. Telephone number 859-699-8543 is the same telephone number investigators identified as being carried and utilized by Fishback.

20.     On November 28, 2023, members of the LRO established surveillance in the vicinity of 175 North Locust Hill Drive, unit #1704. This was a residence identified in this investigation as being utilized by Fishback and Hawkins. At approximately 12:47 pm, investigators observed Fishback and a black female exit apartment unit #1704. Investigators would observed Fishback and the black female travel to 751 Lane Allen Road, Lexington, Kentucky in Fishback's Chevrolet Cruze. At approximately 1:35 pm, investigators observed Fishback and the black female exit the Chevrolet Cruze and walk toward the back of the building located at 751 Lane Allen Road, Lexington, Kentucky. At approximately 2:12 pm, investigators observed a red Chevrolet Silverado with Kentucky license plate 8220CH arrive at 751 Lane Allen Rd, Lexington, Kentucky. A white male that was later identified as Kolby Burdine exited the truck and approached the front door of 751 Lane Allen Rd. Burdine knocked on the front door and waited for several minutes with no one answering. Burdine next returned to the truck and departed the area.

21.     At approximately 2:22 pm, investigators observed Fishback return to the Chevrolet Cruze from the area of 751 Lane Allen and drive to a neighboring business identified

as The Locker Room Sporting Goods, located at 739 Lane Allen Rd, Lexington, Kentucky. At approximately 2:25 pm, affiant observed the aforementioned red Chevrolet Silverado return and park near 751 Lane Allen Rd, Lexington, Kentucky. At that time, Burdine walked from his truck to the parked Chevrolet Cruze where he entered the passenger side of the vehicle. After a period of several minutes, the Chevrolet Cruze moved its position and returned to 751 Lane Allen Road .At approximately 2:31 pm, Burdine exited Fishback's vehicle and enter the rear driver side. At the same time, the same black female observed previously exited 751 Lane Allen Road and entered the front passenger side of the Chevrolet Cruze. After approximately 5 minutes, Burdine returned to his truck and departed the area. Surveillance was maintained of Burdine until a traffic stop was conducted on the vehicle by members of LPD on Cromwell Way, Lexington, KY.

22.     During the traffic stop, three individuals including Burdine were identified as being present in the truck. A trained LPD drug odor detection canine was deployed and alerted to the odor of narcotics emanating from inside the truck. During a search of Burdine's truck, members of LPD located and seized as evidence approximately 3.5 blue pills marked "M30" that were concealed in the glovebox. These pills were consistent with the type of pill containing fentanyl that were seized from Fishback's Stoney Brooke Apartment. Burdine ultimately claimed ownership of the pills but did not identify from whom he received them. Burdine was subsequently charged in Fayette County Kentucky District Court Case 23-F-03505 for the offenses of Possession Controlled Substance First Degree Carfentanil of Fentanyl Derivatives and Possession of Marijuana. Burdine has a listed address for this case as 2033 Clays Mill Road, Lexington, Kentucky and provided his home phone as telephone number 859-691-1889.

23.     Following the transaction between Fishback and Burdine, members of the LRO received toll data via an administrative subpoena for telephone number 859-699-8543, utilized

by Fishback, for the date of November 28, 2023. From approximately 12:54 pm to 2:27 PM on that date, Fishback's telephone number 859-699-8543 engaged in a series of voice calls and text messages with telephone number 859-691-1889. A check of a reliable law enforcement database revealed telephone number 859-691-1889 to be associated with a "Kristina Rogers" at an address of 2033 Clays Mill Road, Lexington, Kentucky. This is the same address utilized by Burdine on his arrest citation later that day. Additionally, the Facebook account for "Kristina Marie", located at 222.facebook.com/kristina.marie.mf.rogers, lists that individual as being in a relationship with Kolby Burdine. This confirmed communications between Burdine and Fishback surrounding the transaction which led to the seizure of suspected fentanyl pills from Burdine's truck.

24.     On December 6, 2023, affiant applied for and received authorization from United States Magistrate Judge for the Eastern District of Kentucky Matthew A. Stinnett to search unit #1704 at 175 North Locust Hill Drive, Lexington, Kentucky for items including controlled substances, drug proceeds, and other items related to the distribution of illegal drugs. That same day, at approximately 5:00 pm, members of the LRO executed the search warrant at unit #1704 at 175 North Locust Hill Drive, Lexington, Kentucky. Hawkins was found to be the sole person present at the time this warrant was executed.

25.     Inside the residence, investigators located and seized approximately 116.4 gross grams, inclusive of packaging, of suspected fentanyl pills in 3 plastic bags stored in a kitchen cabinet. The pills were blue in color with the "M" marking on one side consistent with the other pills seized throughout the course of this investigation. It is affiant's experience that these pills are consistent with counterfeit prescription pills known to contain fentanyl and fentanyl derivatives. That evening at the DEA Lexington Resident Office investigators utilized a reliable, hand held mass spectrometer to examine the suspected narcotics. As is common for controlled

substances containing fentanyl and fentanyl derivatives manufactured in this way, the field testing device could not definitively identify the substances contained within the pills. Affiant is aware that this is a common result for counterfeit pills that routinely are found to contain fentanyl when they are tested by forensic chemists in a laboratory environment.

26.     Also, in the residence inside the living room closet agents located 268.4 gross grams of suspected marijuana packaged for resale in plastic baggies. A digital scale containing suspected marijuana "shake" was located in close proximity to the packaged marijuana within the closet. Agents located a receipt inside the apartment with the name "Eugene Fishback" listed on it.

27.     Following the discovery of the suspected fentanyl pills inside unit #1704, affiant directed that Fishback be detained by other law enforcement personnel. Fishback had been under DEA LRO surveillance since approximately 10:10 am that morning. LRO investigators had observed Fishback and Hawkins exit unit #1704, travel to Georgetown, Kentucky in the Chevrolet Cruz, and return to 175 North Locust Hill Drive, Lexington, Kentucky at approximately 3:07 pm.  Fishback departed the apartment alone shortly after in the Chevrolet Cruze and was observed to conduct suspected drug transactions with at least two individuals at separate locations in Lexington, Kentucky. At the direction of affiant, Fishback was detained by members of the Kentucky State Police (KSP) Interdiction Team as he exited Hibbett Sports located at 3174 Richmond Road, Lexington, Kentucky following the discovery of suspected fentanyl pills in the apartment. At the time of his detention, Fishback was found to be in possession of the Apple Iphone with red case.

28.     Following his detention, members of the KSP Interdiction Team presented a trained drug odor detection canine to conduct a sniff of the exterior of Fishback's Chevrolet

Cruze. Inside the vehicle, investigators located 357.5 gross grams of blue pills marked "M" and "30" in three plastic baggies. Two baggies were located in the center console of the vehicle with a larger plastic bag, 129.6 gross grams, of pills in the driver's door. A receipt for jewelry as well as a purchase agreement for a Chevrolet Cruze both in the name of Eugene Fishback were located inside the vehicle. During his detention, Fishback was allowed to keep his cellular telephone with his person. Affiant observed a number of telephone calls to a cellular telephone seized from Hawkins during the execution of the search warrant at the apartment with a contact ID of "Geno" during this period. Following the location of the pills inside his vehicle, Fishback was placed under arrest for Conspiracy to Knowingly and Intentionally Possess with Intent to Distribute a Mixture or Substance Containing a Detectable Amount of Fentanyl, a Schedule II Controlled Substance.

29.      The three bags of suspected fentanyl pills seized from the Chevrolet Cruze were likewise transported to the DEA Lexington Resident Office for processing that evening. Similar to the pills located in the kitchen cabinet of unit #1704 at 175 North Locust Hill Drive, Lexington, Kentucky, a reliable, hand held mass spectrometer was utilized to field test the suspected narcotics but could not definitively identify the substances contained within the pills. Again, affiant is aware from personal experience that this is common field test result for counterfeit prescription pills containing fentanyl.

30.      Following his arrest and processing at the DEA LRO, Fishback was transported the Fayette County Detention Center (FCDC) to be held pending his initial appearance before a Magistrate Judge in the Eastern District of Kentucky. A DEA LRO task force officer familiar with Fishback's voice reviewed recorded telephone calls from the jail in the intake area. The officer identified that Fishback made a series of telephone calls at the FCDC in which he

expressed concern that Hawkins had provided information to the police regarding his drug trafficking activities. He also instructed the party to whom he conversed to tell other people they communicated with to change their telephone numbers as law enforcement was going to attempt to access a cellular telephone seized in conjunction with his arrest. Affiant had previously asked Fishback for consent to search his telephone which he denied. This indicated that Fishback was concerned that other members within his DTO would also risk criminal liability if their identities were known or communications between their devices were uncovered.

31.     Based on my knowledge, training, and experience, I am aware that drug traffickers frequently use cellular telephones to communicate with each other in the course of their drug enterprises. Cellular telephones are readily accessible and disposable. They can be utilized to communicate orally or through the transmission of electronic messages. Cellular telephones are often utilized as a method of thwarting law enforcement due to the relative anonymity with which they can be purchased and billed. Additionally, drug traffickers often utilized multiple devices to compartmentalize communications within their organization.  In this instance, investigators observed Fishback use a cellular device with telephone number 859-699-8543 surrounding a drug transaction on November 28, 2023. Additionally, both a drug source of supply and customer for Fishback identified telephone number admitted 859-699-8543 as being used to facilitate his drug transactions.

32.     Based on my knowledge, training, and experience, and consultations with other experienced investigators, I know that these devices such as the Apple Iphone hold electronic stored information sought in this warrant, including call history (both incoming and outgoing), voicemail, photographs, videos, internet browsing history, and electronic communications (both

emails and text messages) and electronic data (files, documents, records, etc) and communications from other electronic "applications" installed on these devices.

33.     The devices described in this affidavit is currently in the lawful possession of investigators at the DEA Lexington Resident Office in Lexington, Kentucky.  As noted above, the devices came into the possession of the law enforcement when they were seized pursuant to the arrest of Eugene Fishback surrounding the distribution of illegal drugs.  In my training and experience, I know that the devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of investigators.

34.     Based on my knowledge, training and experience, and consultation with other law enforcement personnel, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing

14

and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  Digital tablet:  A digital tablet, or tablet, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some tablets also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  Tablets usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most tablets run computer software, giving them many of the same capabilities as personal computers.  For example, tablets users can work with word-processing documents, spreadsheets, and presentations.  Tablets may also include global positioning system ("GPS") technology for determining the location of the device.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

16

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h. External hard drive: A hard drive is a computer component that holds data. Every computer needs at least one hard drive to store its operating system, programs and user information. This drive usually is internal, or built into the computer, but as computer systems have evolved and different needs, threats and circumstances have arisen, external hard drives have become more popular. External hard drives usually are used in addition to internal hard drives in order to store more data. They also allow the user to put sensitive, confidential or otherwise important

17

information on them, then disconnect them and store them in secure locations. An external hard drive sits outside the main computer tower in its own enclosure. This portable encasement is slightly larger than the hard drive itself, and it sometimes contains a cooling fan. The external hard drive is connected to the computer via an interface cable, which allows the external hard drive to communicate with the computer so that data can be passed back and forth.

i.   SIM card:  A Subscriber Identity Module (SIM) card is a portable memory chip used mostly in cell phones that operate on the Global System for Mobile Communications (GSM) network. These cards hold the personal information of the account holder, including his or her phone number, address book, text messages, and other data. When a user wants to change phones, he or she can usually easily remove the card from one handset and insert it into another.

j.   Memory card:  Memory cards are used for the storage of various types of electronic data. Sometimes referred to as a flash memory card, the standard card is capable of storing a wide range of data files, such as audio and video clips, images, and text documents. In general, these cards have a high amount of capacity, which makes them ideal for storing larger data files.

k.   Personal MiFi spot: A personal WiFi hotspot is a portable bubble of Internet connectivity that can be used on the go to connect up to five devices. The personal WiFi hotspot is created by a battery-operated, pocket-sized, miniature router compliant with cellular broadband standards. Products with compatible wireless modems or adapters, such as cellular telephones, can jump on the network to

18

collect mail, stream videos or just surf the Web. The advantage of a personal WiFi® hotspot is that it can be created anywhere within the carrier's broadcasting range. Networks created by portable cellular routers are encrypted with Wi-Fi Protected Access (WPA).

35.     In my training and experience, examining data stored on devices listed above can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Additionally such a device may provide relevant information about other DTO members, their specific roles within the organization, and evidence which may be used in their prosecution. Based on my knowledge, training, and experience, and consultation with other law enforcement personnel, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.     I believe there is probable cause to believe that things that were once stored on the device seized may still be stored there, for at least the following reasons:

> Based on my knowledge, training, and experience, I know that computer files/telephone files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer or cellular telephone, the data contained in

the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. In the case of the wireless telephone devices with Internet access, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence

may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

I know that when an individual uses an electronic device to call a potential witness in an attempt to have the witness obstruct justice, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

38.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination the Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

39.     *Manner of execution.*  Because this warrant seeks only permission to examine the devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST FOR SEALING

40.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

41.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

/s/ Jason D. Moore

Jason D. Moore
Special Agent
DEA

Attested by affiant by reliable electronic means per FRCrP 4.1 on this 14th day of December, 2023.

MATTHEW A. STINNETT
U.S. MAGISTRATE JUDGE

.